UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN VARGO, individually and on behalf of all others similarly situated,<br><br>                              Plaintiff,<br><br>        v.<br><br>PARETEUM CORPORATION, ROBERT H. TURNER and EDWARD O'DONNELL,<br><br>                              Defendants. | Case No. _____<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>Jury Trial Demanded |

Plaintiff John Vargo ("Plaintiff"), by and through his attorneys, alleges upon personal knowledge as to himself, and upon information and belief as to all other matters, based upon the investigation conducted by and through his attorneys, which included, among other things, a review of documents filed by Defendants (as defined below) with the United States Securities and Exchange Commission (the "SEC"), news reports, press releases issued by Defendants, and other publicly available documents, as follows:

**NATURE AND SUMMARY OF THE ACTION**

1.      This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Defendant Pareteum Corporation's ("Pareteum" or the "Company") common stock between May 7, 2018 and October 21, 2019, inclusive (the "Class Period"). This action is brought on behalf of the Class for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

2.      In 2015, Pareteum (then named "Elephant Talk Communications"), was a failing penny stock which appeared on the verge of collapse.  The Company's fortunes, however,

appeared to turn in November 2015, when a new management team entered that was led by Robert H. Turner and Vic Bozzo (both discussed *infra*). This team spearheaded 12-month restructuring project which appeared to bear fruit in November 2016 as the Company slowly backed away from the brink of bankruptcy. It was at this time that the Company rebranded itself as "Pareteum."

3.      Purportedly due to the restructuring, the Company began what can only be described as an incredible winning streak – continuously reporting record revenues for every quarter in 2018 and the first two quarters in 2019. In fact, the Company's reported revenues increase from $4.1 million to $34 million in 6 quarters – representing an increase of 730%. The chart below illustrates this increase in revenues:



4.      This impressive growth quickly drew investor and analyst attention, and the Company's common stock rose from $1.75 per share on January 2, 2019 to high of $5.70 per share in March of 2019 – an increase of 225%. At least one analyst predicted that the stock could go as high as $9.00 per share before the end of 2019.

5.      Pareteum's rags-to-riches storyline would start to fall apart in the summer of 2019 – when its meteoric growth began to draw the attention of sceptics in the market.

Questions began to arise regarding the Company's business plan, customer base and the legitimacy of its financial reports. Then, the bottom fell out.

6.      On October 21, 2019, Pareteum reported that it had been improperly recognizing revenues for all of 2018 and the first two quarters of 2019, and the Company's financial statements for those periods would be restated. According to Company estimates, the restatements could negate $9 million dollars of revenue for 2018 and $24 million for the first two quarters of 2019. This news shocked investors – as the Company appeared poised to negate over 42% of the aggregate revenue previously recorded for that period. The Company's share price reacted as one would expect, falling from $0.74 per share to $0.30 per share on the next day of trading – a drop of almost 60%.

7.      Defendants were motivated to and did conceal the true operational and financial condition of Pareteum, and materially misrepresented and failed to disclose the conditions that were adversely affecting the Company throughout the Class Period, because it (i) enabled them to deceive the investing public regarding Pareteum's business, operations, management and the intrinsic value of Pareteum's common stock; (ii) enabled defendants to artificially inflate the price of Pareteum's common stock; and (iii) caused Plaintiff and other members of the Class to purchase Pareteum common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, jointly and individually took the actions set forth herein.

## JURISDICTION AND VENUE

8.      The federal law claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, as well as under the common law.

9.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

10.     This Court has jurisdiction over each Defendant named herein because each Defendant is an individual or corporation who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1931(b), as the Company has its principal executive offices located in this District and conducts substantial business here.

12.     In connection with the acts, omissions, conduct and other wrongs in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including but not limited to the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

13.     Plaintiff John Vargo is an individual residing in Jacksonville, FL. He acquired and held shares of Pareteum at artificially inflated prices during the class period and has been damaged by the revelation of the Company's material misrepresentations and material omissions.

14.     Defendant Pareteum is a Delaware corporation with its principal place of business in New York, NY. The Company trades on the NASDAQ stock exchange under the ticker symbol "TEUM." According to the Company's website, Pareteum is leading provider of "Communications Platform as a Service Solution." Pareteum was originally named "Elephant Talk Communications Corp." It changed its name to Pareteum in November 2016 and appointed Vic Bozzo as the newly-named Company's Chief Executive Officer ("CEO")

15.     Defendant Robert H. Turner ("Turner") is the Company's Co-Founder and Chairman. He also took on the role of CEO in November 2018. The Company's website lauds Turner for his vision and experience, claiming that Turner "has set the vision and business tone

4

that has chartered the successful course of numerous international and U.S. domestic communication, software, and technology startup, growth, and Fortune 500 companies." Included among the companies that have benefited from Turner's "vision" is Catcher Holdings. In early 2017, Turner took the position as CEO of Catcher Holdings, a company purported too be a "visionary technology leader." The company collapsed in April 2018 and its stock is now worthless.

16.     Defendant Edward O'Donnell ("O'Donnell") is the Company's Chief Financial Officer ("CFO"). According to the biography found on Pareteum's website, O'Donnell has "25 years of experience in investment banking, private equity investment, and venture capital, in the Software-as-a-Service and digital technology sectors prior." The biography does not disclose that as CFO of AudioEye in 2015, O'Donnell was sued by the company's investors for the "fraudulent booking of revenues" triggering a restatement erasing 92% of the company's reported revenue for the first three quarters of 2014.[1]

17.     Collectively, Turner and O'Donnell are referred to throughout this complaint as the "Individual Defendants".

18.     The Individual Defendants, because of their positions at the Company, possessed the power and authority to control the content and form of the Company's annual reports, quarterly reports, press releases, investor presentations, and other materials provided to the SEC, securities analysts, money and portfolio managers and investors, *i.e.*, the market. The Individual Defendants authorized the publication of the documents, presentations, and materials alleged herein to be misleading prior to its issuance and had the ability and opportunity to prevent the issuance of these false statements or to cause them to be corrected. Because of their position with the Company and

---

[1] This securities class action was filed in the U.S. District Court for the District of Arizona and captioned In re AudioEye, Inc. Sec. Litig., No. 4:15-cv-00163 (D. Ariz.).

access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## RELEVANT NON-PARTY

19.     Vic Bozzo is Pareteum's co-founder. He took the position of CEO on November 1, 2015 in order to oversee the Company's 12-month restructuring initiative. He is currently the Company's Chief Commercial Officer and "is responsible for driving Pareteum's market presence, revenue generation, customer relationships, and business development."

## SUBSTANTIVE ALLEGATIONS

20.     Pareteum is the successor in interest to Elephant Talk Communications ("ETC"), which analysts described as a global provider of mobile proprietary Software Defined Network Architecture (ET Software DNA® 2.0) platforms for the telecommunications industry. By 2015, however, ETC was also a failing penny stock with declining revenues and an audit opinion in its Annual Report for 2014 questioning its ability to operate as a going concern.

21.     ETC's fortunes appeared to turn in late 2015, when a new management team entered led by then CEO and Chairman Bozzo  Under Bozzo's supervision, the Company undertook a 12-month restructuring effort that included job cuts, restructured financing, and a series of private placements which culminated in rebranding the company as Pareteum on Novembers 1, 2016. In the press release announcing the shake-up, Bozzo reassured the Company's investors, stating:

> I am very excited to be joining the Pareteum team at the cusp of a transformation in the telecommunications industry. My goal is to apply the same value-creation principles that led to strong customer and investor satisfaction in my past ventures.

6

22.     For a while, the rebranding and restructuring appeared to be a wild success, with the Company's reporting soaring revenues and its share price rising in lock-step – creating a buzz among the investor community and analysts – as described below.

**Materially False and Misleading
Statements During the Class Period**

23.     The Class Period begins on May 7, 2018, when Pareteum issued a press release announcing its financial results for the first quarter of 2018. The Company told investors that it had a record quarter with revenues of $4.113 million, up 47% on a year-over-year basis. The press release also contained a message to investors from Defendant Turner:

> ***This quarter represents a record quarterly revenue milestone since we executed our turnaround and transformed the business in 2016.[2]*** I am also extremely pleased and proud to report that we generated positive operating cash flow in the first quarter, a full quarter earlier than expected. First quarter revenue would have been $4.22 million, but we instituted Accounting Standard for Revenue Recognition (606) for our SaaS business model and did not recognize $107,000 of deferred revenue in the first quarter. All of our profitability metrics improved dramatically; Adjusted EBITDA, EBITDA, operating loss and cash flow from operations. ***Key performance indicators of connections, backlog conversion, connection values, revenue per employee and churn continue to all move in the right direction and give us confidence in our overall strategy and business execution***. We also invested in product development and sales and marketing during the quarter, as we prepare to scale our business for expected growth and profitability. Our TEUM remains laser focused on converting backlog to revenue, servicing our clients, selling into new geographical markets and creating shareholder value.

24.     In addition, the Company's 10-Q for that period, which was filed with the SEC, attested to the effectiveness of Pareteum's disclosure controls and procedures, stating:

> As of March 31, 2018, the Company carried out an evaluation, under the supervision and with the participation of the Company's management, including the Company's Principal Executive Officer and Principal Financial and Accounting Officer, of the effectiveness of the design and operation of the Company's disclosure controls and procedures, as defined in Rule 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934. Based on the evaluation, the Company's Principal Executive Officer and Principal Accounting Officer have concluded that

---

[2] Unless otherwise indicated, all emphasis herein has been added.

the Company's disclosure controls and procedures are effective to ensure that information required to be disclosed by the Company in the reports it files or submits under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms and is accumulated and communicated to our management as appropriate to allow timely decisions regarding required disclosure.

25.     In addition, the first quarter 10-Q also contained certifications signed by Defendants Turner and O'Donnell attesting to the accuracy and completeness of the Company's financial and operational reports, which state:

## CERTIFICATION

I have reviewed this quarterly report on Form 10-Q of Pareteum Corporation.;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of a quarterly report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

26.     Pareteum announced another good quarter on August 6, 2018, when the Company issued a press release announcing its financial results for Q2 2018. Among other things, the release touted $6 million in revenue, an 85% increase in revenue year-over-year and raised revenue guidance to 80% for all of 2018. The press release again contained a message to investors from Defendant Turner:

> The quarter ended June 30, 2018, marks the achievement of materially significant milestones for Pareteum as it continues to evolve into a high-growth, software-based, enabling cloud services company. Our results include attainment of positive Net Income and positive EBITDA for the first time in Company history. ***Surpassing $6 million in revenues in the second quarter demonstrates the efficiency of our employees in converting our Contract Revenue Backlog into revenue***. Today we operate with our Global Enablement Cloud, fueled by the award winning, and, customer affirmed, software applications, solutions and application programming interfaces (APIs). It is this combination that is making our services and software the developer community's first choice for connectivity and

communications. We generated positive EBITDA and Net Income, validating the efficient scalability of our business. We are continuing to grow our revenues, clearly seen in our results as we are driving financial performance and cash to the bottom line. ***Key performance indicators of Connections, Contract Revenue Backlog conversion, Connection values, revenue-per-employee and churn continue to all move in the right direction and give us confidence in our overall strategy and business execution***. Our TEUM remains laser focused on converting backlog to revenue, servicing our clients, selling into new geographical markets and creating shareholder value.

27.     In addition, the Company reported that it had raised 2018 Outlook to at least 80% revenue growth, and that the Company's prospects for 2018 were generally outstanding, stating that:

> ***Based on our 36-month contractual revenue backlog of $200 million, as of March 31, 2018, and 2,200,000 connections, we are raising our 2018 outlook. The Company now expects 2018 revenue growth of at least 60% over 2017***, up from the previous provided guidance of 50%. Also, with its current cost structures, Pareteum expects positive, EBITDA, and cash from continuing operations for the full year 2018*. **As we convert backlog to connections, our revenue will increase and for every incremental dollar of revenue***, we expect contribution to our bottom line. Our target gross margins are 70-75%.

28.     The Defendants' Q2 financial report, filed with the SEC, was signed and Certified by Defendants Turner and O'Donnell and contained representations which attested to the purported effectiveness and sufficiency of the Company's controls and procedures – as well as the completeness and veracity of Overstock's disclosures and reports. These representations were substantially similar or the same as those statements contained in the Company's financial report for Q1 2019, discussed supra at ¶¶ 24-25.

29.     Apparently on a roll, Pareteum issued a press release on November 7, 2018 announcing the Company's financial results for the third quarter of 2018. The Company told investors that it had yet another record quarter with revenues of $8 million – an increase of 129%

year-over-year. As now customary, the release also contained a message to investors from Defendant Turner:

> *The quarter ended September 30, 2018, marks our continued evolution into a high-growth, software-based, enabling cloud services company. Surpassing $8 million in revenues in the third quarter demonstrates the efficiency of our employees in converting our Contract Revenue Backlog into revenue*. Our results include growth in adjusted EBITDA, which reflects the scalability of our recurring revenue SaaS business model. Subsequent to the end of the third quarter, we closed the Artilium acquisition and have been busy integrating and streamlining the businesses and eliminating redundant expenses. *We are continuing to grow our revenues, clearly seen in our results as we are driving financial performance and cash to the bottom line. Key performance indicators of Connections, Contract Revenue Backlog conversion, Connection values, revenue-per-employee and churn continue to all move in the right direction* and give us confidence in our overall strategy and business execution. Our TEUM remains laser focused on converting backlog to revenue, servicing our clients, selling into new geographical markets and creating shareholder value.

30.     In addition, the release identified key financial and business "metrics" for third quarter 2018:

- *Revenues increased by 129% to $8 million*
- Adjusted EBITDA improved by over $1.2 million, or 195%, to $1.8 million
- Non-GAAP Earnings Per Common Share improved to $0.01 for Q3 2018, compared to ($0.12) for Q3 2017
- Increase in total assets from $10 million to $35 million
- Cash balance of $18.9 million
- *Dollar-based expansion rate where customers of record in 2017 have grown their revenue dollar spending by 147% in the third quarter of 2018 versus the third quarter of 2017*

                    *        *        *

- Awarded 19 contracts aggregating to $403 million in total contract value, which added $127 million to 36-month Contractual Revenue Backlog
- *Increased 36-Month Contractual Revenue Backlog from $276 million at end of the second quarter of 2018 to $403 million; includes $72 million incremental from existing contracts*
- *Contractual Revenue Backlog conversion rate at 100%*
- Ended the third quarter of 2018 with 2,903,000 Connections, an increase of 127% over the end of the third quarter of 2017 and 7% higher than the second quarter of 2018

31.     The Defendants' Q3 2018 financial report, filed with the SEC on Form 10-Q, was signed and Certified by Defendants Turner and O'Donnell and contained representations which attested to the purported effectiveness and sufficiency of the Company's controls and procedures, as well as the completeness and veracity of Overstock's disclosures and reports. These representations were substantially similar or the same as those statements contained in the Company's financial report for Q1 and Q2 for 2019, discussed supra at ¶¶ 24-25.

32.     Pareteum reported yet more good news on March 12, 2019, when the Company issued a press release announcing its financial results for the fourth quarter of 2018 and the entire year. The Company announced that 2018 was a record year and the Company was reporting and $14.3 million in revenue for Q4 2018. The release contained the usual message to investors from Defendant Turner:

> *2018 was a record year for Pareteum, achieving over 139% year-over-year revenue growth* driven by the effectiveness of our cloud-based platform, innovative product solutions, employee talent and leading customers. *In fourth quarter of 2018, we reported 256% year-over-year revenue growth, which included the first full quarter of our accretive Artilium acquisition.* We are extremely pleased with Pareteum's significant results in 2018 which are attributed to our TEUM's laser focus on sales expansion and operational improvements. Looking ahead to 2019, we are very excited about the tremendous opportunities for Pareteum given the strong industry dynamics; our visibility into future revenue from our *36 Month Contractual Revenue Backlog*; and, the augmented talent, product, services, network expansion and productivity improvements implicit from our strategic acquisitions."

33.     In addition, the release contained the following financial highlights:

### FOURTH QUARTER 2018 FINANCIAL RESULTS:

**(Unless otherwise noted, all comparisons are made to the fourth quarter of 2017)**

- *Total revenues increased 256% to $14.3 million*
- *In December of 2018 our Global Software Defined Cloud (GSDC) revenue was 51% of our total revenue, with 35% in Managed Services (MSP) revenues, and Super API of 14%*
- Adjusted EBITDA increased 82% to $2.34 million
- Non-GAAP EPS of $0.02 cents

- Artilium financials are fully consolidated and accretive in Pareteum's fourth quarter results
- Net Dollar-based expansion rate represented 214% growth

### FULL YEAR 2018 FINANCIAL RESULTS:

**(Unless otherwise noted, all comparisons are made to full year of 2017)**

- ***Revenues increased 139% to $32.4 million***
- Adjusted EBITDA improved 199% year-over-year to $6.4 million
- Non-GAAP EPS of $0.09 cents compared to $0.05 cents for year ending 2017
- We ended the year with a $6.1 million cash balance and no secured debt

34.     The Defendants' financial report for Q4 and fiscal year 2018, filed with the

SEC on Form 10-K, was signed and Certified by Defendants Turner and O'Donnell in

accordance with 18 U.S.C. Section 1350, as adopted pursuant to Section 302 of the

Sarbanes-Oxley Act of 2002. These certifications stated:

1.      I have reviewed this annual report on Form 10-K of Pareteum Corporation for the year ended December 31, 2018;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this interim report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal controls over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those

entities, particularly during the period in which this report is being prepared;

b)       Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)       Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation;

d)       Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

5.       The registrant's other certifying officer and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

a)       All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)       Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

35.       Things looked even better for the Company when announced its financial results for Q1 2019 on May 10, 2019. To the delight of investors, the Company reported revenues of $23 million, representing an astounding 460% increase year-over-year. The press release also contained the standard statement to investors Defendant Turner:

We are very pleased with our strong first quarter results, ***delivering 460% revenue growth in Q1 2019 compared to Q1 2018*. Pareteum's core business, pre-acquisitions, has grown 33% over the prior quarter.** We are proud of the significant business transformation we have achieved over the past few years.

14

Pareteum is a fast-growing and profitable SaaS and communications service provider. Our software and platform solutions are unique in the market, our global TEUM is executing, we are well positioned to capture the large market opportunity, and we are committed to our mission to *connect every person and every(thing)™*.

36.    In addition, the release contained the following financial and operational highlights:

### FIRST QUARTER 2019 FINANCIAL RESULTS:
**(Unless otherwise noted, all comparisons are made to the first quarter of 2018)**

- ***Total revenues increased 460% to $23 million***
- Adjusted EBITDA increased 1,723% to $5.2 million
- Non-GAAP EPS of $0.02 cents
- Artilium and iPass financials are consolidated and accretive in Pareteum's first quarter results
- Net Dollar-based expansion rate represented 144% growth
- Increase in total assets from $27.2 million at March 31, 2018 to $236.9 million at March 31, 2019
- Cash balance of $10.7 million

### KEY FIRST QUARTER OF 2019 OPERATIONAL METRICS:

- ***36-Month Contractual Revenue Backlog increased to $938 million for the first quarter of 2019, up from $200 million in the first quarter of 2018 with a conversion rate to revenue of 101%***
- Connections increased 441% to 12,012,000 for the first quarter of 2019, and grew 161% sequentially in the first quarter of 2019
- First quarter average annualized revenue per employee of $390,000, an increase of 55% year over year

37.    The Defendants' Q1 2019 financial report, filed with the SEC on Form 10-Q, was signed and Certified by Defendants Turner and O'Donnell and contained representations which attested to the purported effectiveness and sufficiency of the Company's controls and procedures, as well as the completeness and veracity of Overstock's disclosures and reports. These representations were substantially similar or the same as those statements contained in the Company's financial report discussed supra at ¶¶ 24-25.

38.    Finally, on July 10, 2019, Pareteum, filed its quarterly report for the period ending June 1, 2019 on Form 10-Q with the SEC. Once again, the Company seemed to be growing at a

breakneck speed – reporting over $34 million in revenue for Q-3 and over $57 million for the first two quarters of 2019 combined.

39.     The Defendants' Q2 financial report filed, with the SEC on Form 10-Q, was signed and Certified by Defendants Turner and O'Donnell and contained representations which attested to the purported effectiveness and sufficiency of the Company's controls and procedures, as well as the completeness and veracity of Overstock's disclosures and reports. These representations were substantially similar or the same as those statements contained in the Company's prior financial report, discussed supra at ¶¶ 24-25.

40.     The statements in ¶¶ 23-39 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations and prospects. Specifically, the Defendants misled investors by falsely telling them that the Company was consistently booking record revenues on a year-over-year basis above and that the Company was poised for further growth.

41.     It was also not true that Pareteum contained adequate systems of internal operational or financial controls, such that Pareteum's annual and quarterly reports filed with the SEC were not true, accurate or reliable.

*The Truth Emerges*

42.     The Company's story of incredibly rapid growth would be drawn into question on June 7, 2019, when the short seller with the pseudonym Marcus Aurelius published a report on Pareteum entitled "TEUM: Where Are The Customers?"[3] This report alleged that the Company's financials were fatally flawed – if not criminal. Among other things, Aurelius alleged that

---

[3] *See* http://aureliusvalue.com/research/teum-where-are-the-customers/

Pareteum's stock was "uninvestible" and that the Company's public claims regarding its customer base did not hold up to "investigative scrutiny."

43.     For example, Aurelius alleged that the Company was reporting sham contracts with non-existent customers. As part of his investigation, he looked into the Company's claims that it had signed a group of contracts worth $50 million. Aurelius visited one of the purported company's in this group -- "Eyethu Mobile Network" – and reported that the company did not exist, stating the following:

> Our investigators went to visit Eyethu/EMN's headquarters but discovered only a dilapidated shack and crumbling structures near a rural African village (below).



44.     The publication of the Aurelius report immediately caused turmoil among investors, causing the stock to plunge $0.83 or 24% to close at $2.58 in a single day of trading.

45.     The final shoe would drop on October 21, 2019, when the company announced after market's closed that it would restate its financials based on a conclusion that the Company

improperly recorded revenues in 2018 and the first two quarters of 2019. Investors were also warned to no longer rely on the company's previously issued financial results.

46.     According to Company estimates, the restatements could negate $9 million dollars of revenue for and ***$24 million for the first two quarters of 2019.*** This news shocked investors – as the Company appears poised to negate over 42% of the aggregate revenue previously recorded for that period.

47.     In addition, the company said that aside from revenue, it expected cost of service, operating income, net loss, accounts receivable and other balance sheet line items to be affected.

48.     News of the restatement resulted in the price of Patereum's common stock cratering. Falling from $0.74 per share to $0.30 per share on the next day of trading – a drop of almost 60%. The following chart illustrates the run-up and eventual crash of the Company's share price:



49.     Sadly, analysts are uncertain if the Company's troubles are over. One analyst writing for the investor publication Alpha Stock News cautioned investors those who might be anticipating a rebound in the Company's share price:

In my view, the around 50% declines that we're seeing in the value of Pareteum today [October 22, 2019] are just the beginning of what's ahead. Unfortunately, about $33 million of the company's revenue is about to be wiped off of its balance sheet. As if this wasn't painful ahead, there are other expenses that are likely to come of this.[4]

## CLASS ACTION ALLEGATIONS

50.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all persons and entities who purchased or otherwise acquired Pareteum common stock between May 17, 2018 and October 20, 2019, inclusive. Excluded from the Class are Defendants, directors and officers of the Company, as well as their families and affiliates.

51.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

52.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

    a.   Whether the Exchange Act was violated by Defendants;

    b.   Whether Defendants omitted and/or misrepresented material facts;

    c.   Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

    d.   Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

---

[4] *See* https://alphastocknews.com/pareteum-teum-stock-tumbles-on-audit-problems/1861/

     e.   Whether the price of the Company's stock was artificially inflated; and

     f.   The extent of damage sustained by Class members and the appropriate measure of damages.

53.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct alleged herein.

54.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests that conflict with those of the Class.

55.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## FRAUD ON THE MARKET

56.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine that, among other things:

     a.   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

     b.   The omissions and misrepresentations were material;

     c.   The Company's common stock traded in efficient markets;

     d.   The misrepresentations alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

     e.   Plaintiff and other members of the class purchased the Company's common stock between the time Defendants misrepresented or failed to disclose material facts and the time that the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

57.     At all relevant times, the markets for the Company's stock were efficient for the following reasons, among others: (i) the Company filed periodic public reports with the SEC; and (ii) the Company regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news ire services and through other wide-ranging public disclosures such as communications with the financial press, securities analysts, and other similar reporting services. Plaintiff and the Class relied on the price of the Company's common stock, which reflected all information in the market, including the misstatements by Defendants.

## NO SAFE HARBOR

58.     The statutory safe harbor provided for forward-looking statements under certain conditions does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not identified as forward-looking statements when made.

59.     To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

## LOSS CAUSATION

60.     On June 7, 2019, information became public which disputed certain claims made by the Company resulting in a stock drop of $0.83 or 24%. Then, after markets closed on April 21, 2019, the Company disclosed facts contrary to its public statements and financial reports – resulting in a stock drop of $0.40 per share or almost 60%. Both of these events contradicted statements made by defendants during the Class Period and were a causal element of the concurrent declines in the Company's share price.

## CAUSES OF ACTION

### <u>Count I</u>
**Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
(Against All Defendants)**

61.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

62.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

63.    Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon those who purchased or otherwise acquired the Company's securities during the class period.

64.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock. Plaintiff and the Class would not have purchased the Company's common stock at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

### <u>Count II</u>
**Violation of § 20(a) of the Exchange Act
(Against The Individual Defendants)**

65.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

66.     The Individual Defendants acted as controlling persons of the Company within the meaning of § 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions at the Company, the Individual Defendants had the power and authority to cause or prevent the Company from engaging in the wrongful conduct complained of herein. The Individual Defendants were provided with or had unlimited access to the documents where false or misleading statements were made and other statements alleged by Plaintiffs to be false or misleading both prior to and immediately after their publication, and had the ability to prevent the issuance of those materials or to cause them to be corrected so as not to be misleading.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     determining that this action is a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and a certification of Plaintiff as class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Plaintiff's counsel as Lead Counsel;

(b)     awarding compensatory and punitive damages in favor of Plaintiff and the other class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon.

(c)     awarding Plaintiff and other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

(d)     awarding Plaintiff and the other Class members such other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury in this action of all issues so triable.

October 27, 2019                             Respectfully submitted,

                                            /s/ Jeffrey C. Block
                                            Jeffrey C. Block
                                            **Block & Leviton LLP**
                                            260 Franklin Street, Suite 1860
                                            Boston, MA 02110
                                            (617) 398-5600 phone
                                            jeff@blockesq.com